Rhonda R. Trotter (SBN 169241)
 Rhonda.Trotter@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone: (213) 243-4000

Christopher J. Renk (admitted *pro hac vice*)
 Chris.Renk@arnoldporter.com
Michael J. Harris (admitted *pro hac vice*)
 Michael.Harris@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Telephone: (312) 583-2300

*Attorneys for Plaintiff Nike, Inc.*
*[Additional Counsel Listed on Signature Page]*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NIKE, INC.,<br><br>                    Plaintiff,<br><br>    v.<br><br>LA LA LAND PRODUCTION & DESIGN, INC.<br><br>    and<br><br>JOHN GEIGER COLLECTION LLC,<br><br>                    Defendants. | Case No. 2:21-cv-0443<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) Direct and/or Contributory Trademark Infringement in Violation of 15 U.S.C. § 1114**<br>**(2) Direct and/or Contributory False Designation of Origin / Unfair Competition in Violation of 15 U.S.C. § 1125(a)**<br>**(3) Direct and/or Contributory Trademark Dilution in Violation of 15 U.S.C. § 1125(c)**<br>**(4) Unfair Competition in Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.***<br>**(5) Direct and/or Contributory Common Law Trademark Infringement and Unfair Competition**<br><br>**DEMAND FOR JURY TRIAL** |

FIRST AMENDED COMPLAINT

Plaintiff Nike, Inc. ("Nike"), for its Amended Complaint against Defendants La La Land Production & Design, Inc. ("La La Land") and John Geiger Collection LLC ("John Geiger") (collectively, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.     Over the past 50 years, Nike has built an iconic and distinctive brand for its products, a significant aspect of which is the development of distinctive trademarks that consumers associate with Nike's products. Unfortunately, various bad actors in the U.S. and abroad have sought to wrongfully trade off of Nike's famous brand and dupe consumers into purchasing fake Nike products.  These bad actors include not only those who sell these illegal fakes directly to consumers, but various others in the supply chain, including manufacturers and distributors, who provide material assistance to direct-to-consumer infringers. By this Complaint, Nike seeks to hold accountable all bad actors in the supply chain of infringing products, including those acting behind-the-scenes who play a critical and necessary role in the sale of fake Nike products.

2.     As the largest and one of the most widely recognized sellers of athletic footwear in the world, Nike utilizes trademarks on nearly all of its products.  Through Nike's continuous and long-standing promotion, substantial sales, and consumer recognition, the company has developed powerful trademarks rights and created some of the most respected popular sneakers, including the Nike Dunk and the Nike Air Force 1.

3.     Launched over 30 years ago, the Nike Dunk is now recognized as one of the most iconic and influential sneakers of all time.

4.     Today, Nike Dunk sneakers—especially limited-edition collaborations— are coveted by sneakerheads throughout the world.  For example, the 2005 limited-edition Stüssy x Nike SB Dunk Low pictured below currently sells for thousands of dollars in the secondary sneaker market.

FIRST AMENDED COMPLAINT



5.     Like the Nike Dunk, the Air Force 1, first introduced in 1982, has reached cult status.  The Air Force 1 has been named dropped by many pop culture icons and desired for its many collaborations and Nike-designed colorways.

6.     The Air Force 1 has also been a hallmark of the Nike By You customization program, which throughout the years, has fostered customer creativity and allowed consumers to customize a unique version of the shoe that still meets Nike's rigorous quality control standards.

7.     The prized Stüssy x Nike SB Dunk Low, as well as Nike's Dunk shoes generally, Nike's Air Force 1 shoes, and Nike's Nike By You customization program are original, authentic, and creative.  They embody the DNA of sneaker culture.  Nike embraces those qualities. As such, Nike protects its iconic sneaker designs, and its intellectual property in those designs, by rooting out bad actors that undermine the DNA of sneaker culture by manufacturing, promoting and selling fakes.

8.     These bad actors include not only the individuals and companies who sell fake sneakers directly to consumers, but also the entities who provide manufacturing, sourcing, and other production/design services to the direct-to-consumer sellers. Many sellers of fake sneakers lack the resources and connections to manufacture, design, and source the products entirely by themselves. Companies acting behind-the-scenes provide these services and play a critical and necessary role in such unlawful activity.

9.     In order to adequately protect Nike's valuable intellectual property rights, its enforcement of such rights must extend up and down the supply chain—from direct-to-consumer sellers to actors who are participants in and the moving forces behind the infringing activities of fake sneaker sellers. Indeed, without the assistance

FIRST AMENDED COMPLAINT

provided by each of these actors, the unlawful sale of fake Nike sneakers would often not be possible.

10.   La La Land is one of those bad actors. Specifically, La La Land manufactures, distributes, sources, sells, and/or supplies footwear products that infringe upon Nike's intellectual property rights to others who subsequently sell those products to consumers.

11.   For example, La La Land manufactures and provides production and design services to companies such as Warren Lotas LLC ("Warren Lotas"). Warren Lotas is a California-based company that has promoted and sold various fakes of coveted Nike Dunks supplied by La La Land. The table below shows examples of fakes Warren Lotas purchased from La La Land next to genuine Nike Dunks.

| Genuine Nike Dunks | Fakes Purchased from La La Land |
|---|---|
|  Stüssy X Nike SB Dunk Low "Cherry" |  Warren Lotas Freddy Broccolini Chanclas |
|  Nike SB Dunk Low Classic Green/Black/White/Red |  Warren Lotas Toxic Green |
|  Nike SB Dunk Low "J-Pack Chicago" |  Warren Lotas SB Dunk Low Jason |

12.   Additionally, La La Land offered to sell over 20,000 pairs of fake versions

- 4 -

FIRST AMENDED COMPLAINT

of Nike's famous "SB Dunk Low NYC Pigeon" sneakers to Warren Lotas, but the sale was thwarted in October 2020 when Nike filed suit in this Court against Warren Lotas. The table below shows the fake sneakers La La Land offered to sell Warren Lotas next to genuine Nike SB Dunk Low NYC Pigeon sneakers.

| Nike SB Dunk Low NYC Pigeon | Warren Lotas X Staple Pigeon OG |
|---|---|
|  |  |

13.   La La Land has also worked with another shoe "designer," John Geiger Collection LLC ("John Geiger"), to produce shoes that bear Nike's Air Force 1 trade dress.

| Genuine Nike Air Force 1 | Infringing Product |
|---|---|
|  |  |

14.   Sneakers bearing Nike's trademarks that La La Land manufactures, sources, or otherwise provides, such as the sneakers shown above that La La Land sold to Warren Lotas and John Geiger, cause confusion in the marketplace regarding whether they are legitimate authorized customizations or illegal fakes. By supplying Warren Lotas and John Geiger with fake shoes using Nike's registered Dunk and Air Force 1 trade dress and a mark that is confusingly similar to Nike's famous Swoosh design, La La Land knowingly participated in a scheme to intentionally create confusion in the marketplace and capitalize on it. And, by marketing and selling shoes using Nike's registered Air Force 1 trade dress, John Geiger knowingly and intentionally creates confusion in the marketplace and capitalizes on Nike's reputation and the reputation of its iconic shoes.

15.   Nike files this lawsuit in an effort to hold bad actors throughout the supply

FIRST AMENDED COMPLAINT

chain accountable for their critical and integral role in the infringing activities of fake sneaker sellers. Suppliers of fake sneakers such as La La Land are uniquely equipped with connections and manufacturing resources that direct-to-consumer sellers lack, and must be held accountable for enabling the widespread infringement of fake sneaker sellers such as Warren Lotas and John Geiger.

## THE PARTIES

16.   Nike is a corporation organized under the laws of the State of Oregon with a principal place of business at One Bowerman Drive, Beaverton, Oregon 97005.

17.   Upon information and belief, La La Land Production & Design, Inc. is a company organized under the laws of the State of California with a principal place of business at 1701 South Santa Fe Blvd, Los Angeles, California 90021.

18.   Upon information and belief, John Geiger Collection LLC is a company organized under the laws of the Commonwealth of Puerto Rico with a principal place of business at 690 SW 1st Ct. Unit 2516 in Miami.

## JURISDICTION AND VENUE

19.   This action arises under the trademark and anti-dilution laws of the United States, 15 U.S.C. § 1051, *et seq.*, and under statutory and common law of unfair competition. This Court has subject matter jurisdiction at least under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 because this action arises under federal trademark law. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

20.   On information and belief, this Court may exercise personal jurisdiction over La La Land at least because La La Land resides in this District, La La Land's principal place of business is located within this District, La La Land does business in this District, and La La Land has committed acts of infringement at issue in this Complaint in this District.

21.   On information and belief, this Court may exercise personal jurisdiction over John Geiger at least because John Geiger does business in California, including

- 6 -

contracting with La La Land, located in California, to manufacture infringing products at issue; shipping or causing to be shipped infringing products from California; and making available infringing products on its website, https://johngeigerco.com/, that can be purchased in California. On information and belief, John Geiger has made sales of the infringing products to consumers in California. On information and belief, John Geiger has committed acts of infringement at issue in this Complaint in California.

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because La La Land resides in this District, La La Land's principal place of business is in this District, La La Land does business in this District, La La Land is subject to personal jurisdiction in this District, and La La Land has committed acts of infringement at issue in this Complaint in this District. Furthermore, John Geiger does business in this District by way of its relationship with La La Land; John Geiger is subject to personal jurisdiction in this District; and John Geiger has committed acts of infringement at issue in this Complaint in this District.

## FACTUAL BACKGROUND

### A. NIKE

23. Nike's principal business activity is the design, development and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories and services.

24. Nike is the largest seller of athletic footwear and apparel in the world.

25. Nike sells its products directly to consumers through Nike-owned retail stores and digital platforms, and to retail accounts and a mix of independent distributors, licensees and sales representatives in virtually all countries around the world.

26. Nike uses trademarks on nearly all of its products.

27. Having distinctive trademarks that are readily identifiable is an important factor in creating a market for Nike's products, in identifying Nike and its brands, and

1  in distinguishing Nike's products from the products of others.

2    28. As a result of continuous and long-standing promotion, substantial sales,

3  and consumer recognition, Nike has developed powerful trademarks rights.

4  **B.** **N**ike**'s S**woosh **design mark**

5    29. One of Nike's most iconic assets is the Swoosh design:  .

6    30. The U.S. Court of Appeals for the Ninth Circuit has referenced the

7  Swoosh design as an example of a "famous trademark [that has] assumed an exalted

8  status....Consumers sometimes buy products bearing marks such as the Nike

9  Swoosh...for the appeal of the mark itself, without regard to whether it signifies the

10  origin or sponsorship of the product." *Au-Tomotive Gold, Inc. v. Volkswagen of Am.,*

11  *Inc.*, 457 F.3d 1062, 1067 (9th Cir. 2006).

12    31. Nike has continuously promoted and sold products bearing the Swoosh

13  design since 1971, including in connection with dozens of iconic products.

14    32. Nike has used, and continues to use, the Swoosh design on almost all of

15  its products, and in connection with its retail sales of those products.

16    33. Nike has also promoted and sold products bearing the Swoosh design in

17  various orientations and placements.

18    34. Nike has sold billions of products bearing the Swoosh design in the

19  United States, accounting for hundreds of billions of dollars in revenue.

20    35. Nike has spent tens of billions of dollars promoting Swoosh design

21  branded products in the United States.

22    36. Nike advertises and promotes products bearing the Swoosh design

23  through a wide variety of traditional and non-traditional means, including print

24  advertising, event sponsorship, and athlete and team endorsements, to name a few.

25    37. Nike also provides the official uniforms of the National Football League,

26  the National Basketball League ("NBA"), and Major League Baseball, all of which

27  prominently bear the Swoosh design.

28    38. As a result of Nike's promotional and sales efforts over the past nearly

- 8 -

fifty years, the Swoosh design is one of the most famous, recognizable, and valuable trademarks in the world.

39.  The Swoosh design has received unsolicited publicity and praise among consumers and in the media.

40.  The Swoosh design has received judicial and administrative recognition as a famous, recognizable, and valuable trademark.

41.  Nike has registered the Swoosh design on the Principal Register of the U.S. Patent and Trademark Office in connection with a wide array of goods and services. Relevant to this action, Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.

| Reg. No. | Trademark | Reg. Date | Goods | Compl. Ex. |
|----------|-----------|-----------|-------|------------|
| 977,190 |  | Jan. 22, 1974 | Athletic shoes with or without spikes | 1 |
| 1,284,385 |  | Jul. 3, 1984 | Athletic and casual clothing | 2 |
| 1,323,342 |  | Mar. 5, 1985 | Footwear | 3 |
| 1,323,343 |  | Mar. 5, 1985 | Footwear | 4 |
| 1,990,180 |  | Jul. 30, 1996 | Full line of sports clothing | 5 |

42.  Pursuant to 15 U.S.C. § 1065, Nike's U.S. Trademark Registration Nos. 977,190, 1,284,385, 1,323,342, 1,323,343, and 1,990,180 are incontestable and constitute conclusive evidence of the validity of the Swoosh design mark, Nike's ownership of the Swoosh design mark, and Nike's exclusive right to use the Swoosh design mark.

**C.  NIKE'S DUNK WORD MARK AND DUNK TRADE DRESS**

43.  The Nike Dunk sneaker began as a basketball sneaker in the 1980s.

44.  Nike introduced the Dunk sneaker in 1986 in connection with its College

Colors Program. College basketball players had typically worn single color shoes (e.g., white or black). But Nike's College Colors Program offered schools the opportunity to have shoes that mirrored their school colors. Nike's original "Be True to Your School" advertisement for its College Colors Program is reproduced below.



45.    Nike's College Colors Program became wildly popular. At that time in the 1980s, college basketball was reaching new heights among a wide age range of athletes and fans. From east to west, rivalries were strong and network TV brought college hoops, and Nike's Dunk sneakers, to the masses.

46.    The Dunk's adoption and popularity eventually spread beyond basketball culture as the skateboard community organically adopted the Dunk making it a skate icon by the 2000s. From there, the Dunk crossed over sports and fashion, and today it is recognized as one of the most iconic and influential sneakers of all time.

47.    Nike drove the iconic status the Dunk enjoys today, in part, through limited-edition collaborations with designers, artists, and other creatives. For example, in 2005, Nike collaborated with Stüssy to create the limited-edition Stüssy x Nike SB Dunk Low, which was released in 2005 as part of Nike's "Team Manager" series. The Stüssy x Nike SB Dunk Low was one of several collaborations between

FIRST AMENDED COMPLAINT

Nike and others resulting in the release of limited-edition Nike Dunks in 2005.

48.    Another limited-edition collaboration was that between Nike and Jeff Staple, Founder and Creative Director of Staple Design and Reed Space, in 2005 to create the limited-edition Nike SB Dunk Low NYC Pigeon. Nike released 150 pairs of the Nike SB Dunk Low NYC Pigeon at Reed Space's New York storefront. A large crowd camped-out hoping to get a pair, the New York City Police were called, and the release made the cover of the New York Post. The event paved the way for today's sneaker culture that includes resellers, authorized post-sale customizations, and dedicated secondary markets. In fact, the Nike SB Dunk Low NYC Pigeon has been referred to as the "sneaker that started it all," ultimately declaring the birth of sneaker culture.

49.    Since the launch of the Dunks in 1986, Nike has continuously and substantially exclusively used the DUNK word mark and promoted and sold sneakers bearing the Dunk trade dress.

50.    Nike has sold many tens of millions of Dunks in the United States, accounting for hundreds of millions of dollars in revenue.

51.    Nike has also registered the DUNK word mark and the Dunk trade dress on the Principal Register of the U.S. Patent and Trademark Office. Nike owns all right, title, and interest in the U.S. Trademark Registrations identified below.

| Reg. No. | Trademark | Reg. Date | Goods | Compl. Ex. |
|----------|-----------|-----------|-------|------------|
| 3,780,236 | DUNK | Apr. 27, 2010 | Footwear | 6 |
| 3,711,305 |  | Nov. 17, 2009 | Footwear | 7 |
| 3,721,064 |  | Dec. 8, 2009 | Footwear | 8 |

FIRST AMENDED COMPLAINT

52.     Pursuant to 15 U.S.C. § 1065, Nike's U.S. Trademark Registration Nos. 3,780,236, 3,711,305, and 3,721,064 are incontestable and constitute conclusive evidence of the validity of the DUNK word mark and the Dunk trade dress, Nike's ownership of the DUNK word mark and the Dunk trade dress, and Nike's exclusive right to use the DUNK word mark and the Dunk trade dress.

**D.    NIKE'S AIR FORCE 1 TRADE DRESS**

**The Nike Air Force 1 Shoe**

 

53.     Nike released its Air Force 1 sneaker in 1982.

54.     The first Nike basketball shoes to feature Nike Air technology, the Air Force 1 shoes were worn by some of the NBA's most high-profile players of the era, including the "Original Six": Michael Cooper, Bobby Jones, Moses Malone, Calvin Natt, Mychal Thompson and Jamaal Wilkes.   Nike's original Air Force 1 advertisement featuring the "Original Six" is reproduced below.



FIRST AMENDED COMPLAINT

55. Although Nike initially discontinued the Air Force 1 shoes in 1984, demand for the wildly-popular sneakers continued to soar. Just one year later, the Air Force 1 shoes returned to the market because fans demanded it.

56. Within just a few years, the popularity of the Air Force 1 shoes exploded off the basketball court too, and the shoe became a favorite of city youth up and down the East Coast.

57. The cachet of owning Air Force 1 shoes was driven in part by Nike's strategy for releasing new color combinations of the shoe. During the late 1980's and early 1990's, Nike sold the Air Force 1 shoes through hand-selected retail stores instead of its regular catalogue. New "drops" of the Air Force 1 shoes sold out immediately and became highly coveted items among sneaker enthusiasts.

58. In the 2000s, globally recognized artists such as Nelly and Jay-Z further solidified the Air Force 1 shoes in popular culture, referencing the shoes in their lyrics and releasing limited edition collaborations with their albums. The Air Force 1 shoes' growing popularity among globally influential celebrities and music artists propelled it farther beyond sport and into culture. Nike continued to collaborate with various designers to create much-anticipated limited edition Air Force 1 styles and colorways. These collaborations and limited-run releases gave the Air Force 1 shoes a coveted level of prestige and helped spread its gospel to new generations and demographics.

59. Nearly 40 years after its debut, the Nike Air Force 1 shoe has been produced in over 1,700 color combinations, including numerous limited, special, and premium editions. The Air Force 1 shoe remains incredibly popular and has maintained sales in excess of 800 million dollars per year.

60. Consumers looking for a specific style or colorway of Air Force 1 shoes are not limited to the thousands of colorways featured on past Air Force 1 shoes, however. In the mid-2000s, Nike created NikeiD, now known as Nike By You, which turned consumers into their own collaborators by providing color and material customization options for virtually every aspect of the shoes, while at the same time

- 13 -

1   maintaining the iconic Air Force 1 trade dress and ensuring the high-quality of the
2   sneaker and its materials that consumers had come to expect from Nike products.

3       61.   Today, customers can create their own custom Air Force 1 shoes directly
4   on Nike's website through Nike's Nike By You customization service.  This service
5   allows customers to choose the color of thirteen (13) different portions of the Air
6   Force 1 shoes, and further gives the consumer the option of choosing between various
7   types of high-quality leathers and rubbers.  By offering the Nike By You
8   customization service, Nike offers customers an opportunity to customize Air Force 1
9   shoes while maintaining control over the design process to ensure that the quality of
10   the customized designs meets Nike's rigorous quality control standards.

11       62.   For several decades, Nike promoted and sold sneakers bearing the Air
12   Force 1 trade dress.

13       63.   Nike has sold tens of millions of Air Force 1 shoes in the United States,
14   accounting for hundreds of millions of dollars in revenue.

15       64.   Nike has registered the Air Force 1 trade dress on the Principal Register
16   of the U.S. Patent and Trademark Office.  Nike owns all right, title, and interest in the
17   U.S. Trademark Registrations identified below (the "Air Force 1 trade dress").

| Nike Air Force 1 Marks | | | | |
|---|---|---|---|---|
| Reg. No. | Trademark | Reg. Date | Goods | Compl. Ex. |
| 3,451,905 |  | Jun. 24, 2008 | Footwear | 9 |
| 5,820,374 |  | Jul. 30, 2019 | Footwear | 10 |

25       65.   Pursuant to 15 U.S.C. § 1065, Nike's U.S. Trademark Registration No.
26   3,451,905 is incontestable and constitutes conclusive evidence of the validity of the
27   Air Force 1 trade dress, Nike's ownership of the Air Force 1 trade dress, and Nike's
28   exclusive right to use the Air Force 1 trade dress.

- 14 -

E.  **NIKE MAINTAINS STRICT CONTROL OVER ITS TRADEMARKS AND NIKE'S RELATED BUSINESS REPUTATION AND GOODWILL**

66.   Nike's Swoosh design mark, DUNK word mark, Dunk trade dress, and Air Force 1 trade dress are collectively referred to in this Amended Complaint as the "Asserted Marks."

67.   Nike maintains strict quality control standards for its products bearing the Asserted Marks. Genuine Nike products bearing the Asserted Marks are inspected and approved by Nike prior to distribution and sale.

68.   Nike also maintains strict control over the use of the Asserted Marks in connection with its products so that Nike can maintain control over its related business reputation and goodwill. Nike, for example, carefully determines how many products bearing the Asserted Marks are released, where the products are released, when the products are released, and how the products are released.

F.  **DEFENDANTS' UNLAWFUL ACTIVITIES**

69.   La La Land has attempted to capitalize on the strength and fame of Nike and its Asserted Marks by manufacturing and supplying footwear bearing the Asserted Marks and/or confusingly similar marks (the "Infringing Products") to direct-to-consumer sellers of fake Nike sneakers, one of them being John Geiger.

70.   La La Land's website describes itself as a "manufacturing gem in downtown LA's exciting Arts District," and touts the ability to label its products with "Made In LA" / "Made in USA." *See* http://lalaland-design.com/.   La La Land promotes its ability to manufacture "a wide range of shoes, from boots to sandals to sneakers and everything in between." *See* http://lalaland-design.com/shoes/.[1]

71.   One of La La Land's customers is a California-based company called Warren Lotas LLC, which purchased Infringing Products from La La Land in at least mid-2020 and subsequently sold and/or offered to sell those products to consumers.

---

[1] Since the filing of the original complaint, La La Land's website has been taken offline and is not, at the time of the filing of this Amended Complaint, available. However, earlier versions are preserved via the Internet Archive.  *E.g.*, https://web.archive.org/web/20210227235032/http://lalaland-design.com/.

The Infringing Products sold by La La Land to Warren Lotas include at least products known and offered for sale or sold as the Warren Lotas Freddy Broccolini Chanclas, the Warren Lotas Toxic Green, the Warren Lotas Jason Voorhees Dunk Low, and any other footwear products that bear the Asserted Marks and/or confusingly similar marks. Examples of Infringing Products are pictured below next to the Asserted Marks and genuine Nike products bearing the Asserted Marks.



| Asserted Marks | Genuine Dunks | Infringing Products |
|---|---|---|

72.   Upon information and belief, La La Land manufactures, distributes, sources, sells, and/or supplies Infringing Products bearing the Asserted Marks and/or confusingly similar marks, to customers such as Warren Lotas and others.

73.   For example, on May 6, 2020, La La Land sold 1,500 pairs of Jason SB

Dunk Low Sneakers to Warren Lotas, as shown by a La La Land invoice to Warren Lotas totaling $115,500.00. A true and correct copy of the May 6, 2020 La La Land invoice is attached hereto as **Exhibit 11**.

74.  Further, on June 24, 2020, La La Land sold 2,001 pairs of Jason SB Dunk Low Toxic Green Sneakers to Warren Lotas, as shown by a La La Land invoice to Warren Lotas totaling $162,081.00. A true and correct copy of the June 24, 2020 La La Land invoice is attached hereto as **Exhibit 12**.

75.  Additionally, on August 17, 2020, La La Land sold 20,574 pairs of Freddy Broccolini Chanclas Sneakers to Warren Lotas, as shown by a La La Land invoice to Warren Lotas totaling $1,522,476.00. A true and correct copy of the August 17, 2020 La La Land invoice is attached hereto as **Exhibit 13**.

76.  Another of La La Land's customers is Defendant John Geiger.  La La Land has listed John Geiger as a client on its website as well as  on its Facebook page.[2]

77.  Like Warren Lotas, John Geiger has attempted to capitalize on the strength and fame of Nike and its Air Force 1 trade dress by making, promoting, advertising, marketing, and selling in the United States footwear bearing the Air Force 1 trade dress and/or confusingly similar trade dress.  Infringing Products promoted and sold by John Geiger (the "Geiger Products") include all styles of the so-called "GF-01" footwear that bear the Air Force 1 trade dress, including but not limited to the GF-01 All-White Pebbled Leather, GF-01 Hand Distressed Suede, GF-01 Black Pebbled Leather Black Chenille, GF-01 White Pebbled Leather Black Chenille, GF-01 Teal/Peach, and GF-01 Off-White Pebbled Leather, all pictured below and many of which can be found on John Geiger's website at: https://johngeigerco.com/pages/archive.

---

[2] *See* https://web.archive.org/web/20210227235032/http://lalaland-design.com/;
https://www.facebook.com/LalalandDesign/

| Air Force 1 trade dress | Genuine Air Force 1 Shoes | Infringing/Geiger Products |
|---|---|---|
|  |  |  |

78.    On information and belief, John Geiger promotes and sells the infringing Geiger Products on its website <https://johngeigerco.com/> and on a variety of social media accounts, including Facebook, Instagram, Twitter, and YouTube.

- 18 -

FIRST AMENDED COMPLAINT



GF-01 BY JOHN GEIGER "WHITE
PEBBLED LEATHER/LIME
EMBROIDERY"
$ 195.00

GF-01 BY JOHN GEIGER "WHITE
PEBBLED LEATHER/ PINK EMBROID-
ERY "
$ 195.00

79.    During the course of discovery in the instant action, Nike learned that La La Land manufactured  at least one of John Geiger's so-called GF-01 shoes, which is pictured below.  An example of the Infringing Product is pictured below next to the Asserted Marks and genuine Nike product bearing the Asserted Marks.  A true and correct copy of an excerpt of La La Land production document LALA_00000001 containing the image pictured below is attached hereto as Exhibit 14.

| Genuine Nike Air Force 1 | Infringing Product |
|---|---|
|  | |

80.    La La Land's and John Geiger's Infringing Products are not genuine Nike products. Nike did not manufacture or inspect the Infringing Products or any component of the Infringing Products, and it did not authorize La La Land or John Geiger to make, promote, advertise, market, or sell the Infringing Products.

81.    La La Land's and John Geiger's Infringing Products travel in the identical channels of trades and are sold to identical consumers as Nike's genuine products.

82.    La La Land and John Geiger have taken systematic steps in an attempt to falsely associate these Infringing Products with Nike. La La Land and John Geiger have attempted to capitalize on Nike's valuable reputation and customer goodwill by

FIRST AMENDED COMPLAINT

using the Asserted Marks and/or confusingly similar marks, and inducing others to do the same, in a manner that is likely to cause consumers and potential customers to believe that the Infringing Products are associated with Nike, when they are not.

83.   Defendants have intentionally created confusion in the marketplace by, among other things, using Nike's Dunk and Air Force 1 trade dress, and La La Land has intentionally created confusion by using a mark that is confusingly similar to Nike's famous Swoosh design, and inducing others to do the same.

84.   Indeed, there is confusion in the marketplace regarding whether Defendants' Infringing Products are legitimate authorized customizations or illegal fakes, as evidenced by at least the example consumer commentary below.



FIRST AMENDED COMPLAINT



85.    Upon learning of the Infringing Products, Nike filed a complaint for trademark infringement, false designation of origin/unfair competition, trademark dilution, unfair competition, and common law trademark infringement against Warren Lotas in this Court on October 14, 2020.  *See Nike v. Warren Lotas*, Case No. 2:20-cv-09431 (C.D. Cal. Oct. 14, 2020).

86.    On December 14, 2020, this Court entered a Consent Judgment and Permanent Injunction against Warren Lotas for trademark infringement, false designation of origin/unfair competition, trademark dilution, unfair competition, and common law trademark infringement, permanently enjoining Warren Lotas from engaging in, *inter alia*, manufacturing, promoting, advertising, distributing, offering for sale, or selling any products, including but not limited to the Infringing Products depicted above, which are likely to cause confusion or to cause mistake or to deceive persons into the erroneous belief that the Infringing Products are sponsored, licensed, authorized, or are connected or affiliated in some way with Nike or the Asserted Marks. A true and correct copy of this Court's Consent Judgment and Permanent Injunction is attached hereto as **Exhibit 15**.

87.    Unless stopped, Defendants' Infringing Products, Defendants' use of the Asserted Marks, and La La Land's contribution and/or inducement of others to do the

same will continue to cause confusion in the marketplace, including but not limited to initial interest confusion, post-sale confusion, and confusion in the secondary sneakers' markets.

88.   Defendants' actions alleged herein are intended to cause confusion, mistake, or deception as to the source of the Infringing Products.

89.   Defendants' actions alleged herein are intended to cause consumers and potential customers to believe that La La Land's and/or its customers' businesses and products, including John Geiger's infringing Geiger Products, are associated with Nike, when they are not.

90.   By virtue of the acts complained of herein, Defendants' have created a likelihood of injury to Nike's business reputation and goodwill, caused a likelihood of consumer confusion, mistake, and deception as to the source of origin or relationship of Nike's products and La La Land's, its customers', or John Geiger's Infringing Products and have otherwise competed unfairly by unlawfully trading on and using the Asserted Marks without Nike's permission.

91.   Defendants' acts complained of herein are willful and deliberate.

92.   Defendants' acts complained of herein have caused damage to Nike in an amount to be determined at trial, and such damages will continue to increase unless Defendants are preliminarily and permanently enjoined from their wrongful acts.

93.   Defendants' acts complained of herein have caused Nike to suffer irreparable injury to its business. Nike will suffer substantial loss of goodwill and reputation unless and until Defendants are preliminarily and permanently enjoined from the wrongful acts complained of herein.

### COUNT I: DIRECT AND/OR CONTRIBUTORY TRADEMARK INFRINGEMENT IN VIOLATION OF 15 U.S.C. § 1114

94.   Nike repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

95.   Defendants' have knowingly used and continue to use in commerce,

- 22 -

FIRST AMENDED COMPLAINT

without Nike's permission or authorization, the Asserted Marks and/or confusingly similar marks,[3] in connection with products Defendants' manufacture, distribute, source, sell, advertise, offer for sale, and/or supply in the United States, including the Infringing Products. Defendants' have used the Asserted Marks with the knowledge of, and the intent to call to mind and create a likelihood of confusion with regard to and/or trade off the Asserted Marks.

96.    On information and belief, La La Land manufactured, distributed, sourced, sold, and/or supplied the Infringing Products to others whom it knows or has reason to know are engaging in trademark infringement of the Asserted Marks, and with knowledge that such Infringing Products would be advertised, offered for sale, and sold in the United States. La La Land thus materially contributed to the willful offer for sale and sale of goods that infringe upon the Asserted Marks. As a result, La La Land has infringed Nike's trademarks under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

97.    On information and belief, John Geiger manufactured, distributed, sourced, sold, supplied, advertised, and/or offered for sale the Infringing Products bearing the Asserted Marks in the United States.  As a result, John Geiger has infringed Nike's trademarks under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

98.    Nike has no control over the nature and quality of the Infringing Products that Defendants offer, and Nike's reputation and goodwill will be damaged—and the value of the Asserted Marks jeopardized—by Defendants' continued use of the Asserted Marks and/or confusingly similar marks, and La La Land's contribution and/or inducement to others of the same. Because of the likelihood of confusion between Defendants' Infringing Products and the Asserted Marks, any defects, objections, or faults found with Defendants' Infringing Products will negatively reflect upon and injure the reputation that Nike has established for the products it

---

[3] As to Defendant John Geiger, as used in these sections, Asserted Marks refer only to the Air Force 1 trade dress, and Infringing Products refer only to the Geiger Products.

FIRST AMENDED COMPLAINT

offers in connection with the Asserted Marks. As such, Defendants are liable to Nike for infringement of its registered marks under 15 U.S.C. §1114.

99.   As a direct and proximate result of Defendants' wrongful acts, Nike has suffered, continues to suffer, and/or is likely to suffer damage to its trademarks, business reputation, and goodwill that money cannot compensate. Unless enjoined, Defendants will continue to use the Asserted Marks and/or confusingly similar marks, and will cause irreparable damage to Nike for which Nike has no adequate remedy at law. Thus, Nike is entitled to an injunction restraining Defendants and, as applicable, their officers, members, agents, servants, and employees, and all persons acting in concert with them, from engaging in further acts of infringement.

100. Nike is further entitled to recover from Defendants the actual damages Nike has sustained, is sustaining, and/or is likely to sustain as a result of Defendants' wrongful acts.

101. Defendants' use of the Asserted Marks and/or confusingly similar marks has been intentional and willful. Defendants' bad faith is evidenced at least by the similarity of Defendants' Infringing Products to the Asserted Marks. Because of the willful nature of Defendants' wrongful acts, Nike is entitled to an award of treble damages and increased profits under 15 U.S.C. § 1117.

102. Pursuant to 15 U.S.C. § 1117, Nike is also entitled to recover its costs of suit and its attorneys' fees because this is an exceptional case.

**COUNT II: DIRECT AND/OR CONTRIBUTORY FALSE DESIGNATION OF ORIGIN / UNFAIR COMPETITION IN VIOLATION OF 15 U.S.C § 1125(a)**

103. Nike repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

104. The Asserted Marks are federally registered and entitled to protection under federal and common law. Nike has extensively and continuously promoted and used the Asserted Marks for many decades in the United States and worldwide. Through that extensive and continuous use, the Asserted Marks have become famous

- 24 -

and well-known indicators of the origin and quality of Nike products.

105. Defendants' unauthorized use of the Asserted Marks and/or confusingly similar marks constitutes a false designation of origin that is likely to cause consumer confusion, mistake, or deception as to the origin, sponsorship, or approval of Defendants' and/or Defendants' Infringing Products by creating the false and misleading impression that Defendants' Infringing Products are manufactured by, authorized by, or otherwise associated with Nike.

106. On information and belief, La La Land manufactured, distributed, sourced, sold, and/or supplied the Infringing Products to others, including at least Warren Lotas and John Geiger, whom it knows or has reason to know are engaging in trademark infringement, false designation of origin/unfair competition, and dilution of the Asserted Marks, and with knowledge that such Infringing Products would be advertised, offered for sale, and sold in the United States.

107. By manufacturing, distributing, sourcing, selling, and/or supplying the Infringing Products to Warren Lotas, John Geiger, and others, La La Land materially assisted or contributed to Warren Lotas', John Geiger's, and others' offer for sale and sale of goods bearing the Asserted Marks and/or confusingly similar marks in the United States, which is causing and is likely to continue to cause confusion, to cause mistake, or to deceive the public as to the origin, source, sponsorship, approval or affiliation of Warren Lotas' products and John Geiger products. Such conduct therefore constitutes unfair competition, false representation, and a false designation of origin, all in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

108. John Geiger's advertising, offering for sale, and sale of goods bearing the Asserted Marks and/or confusingly similar marks in the United States is causing and is likely to continue to cause confusion, to cause mistake, or to deceive the public as to the origin, source, sponsorship, approval or affiliation of John Geiger products. Such conduct therefore constitutes unfair competition, false representation, and a false designation of origin, all in violation of Section 43(a) of the Lanham Act, 15

U.S.C. § 1125(a).

109.  As a direct and proximate result of Defendants' unlawful conduct, Nike has suffered, and will continue to suffer unless and until such activity is enjoined by this Court, irreparable damage and inherently unquantifiable injury and harm to its business, reputation, and customer goodwill that money cannot compensate.

110.  Defendants' conduct is causing, and is likely to continue to cause, injury to the public and to Nike, and Nike is entitled to injunctive relief and to recover from Defendants actual damages Nike has sustained, is sustaining, and/or is likely to sustain as a result of Defendants' wrongful acts, and/or an award of Defendants' profits, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1116 and 1117. Any such damages and/or profits awarded should be trebled pursuant to 15 U.S.C. § 1117(a).

## COUNT III: DIRECT AND/OR CONTRIBUTORY TRADEMARK DILUTION IN VIOLATION OF 15 U.S.C. § 1125(c)

111.  Nike repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

112.  The Swoosh design mark has become famous throughout the United States as a result of the duration, extent, and geographical reach of advertising and publicity, the amount, volume, and geographical extent of Nike's sales and trading areas, their channels of trade, their degree of recognition, and registration of the marks.

113.  The Swoosh design mark became famous before La La Land used the mark.

114.  Because Nike's products bearing the Swoosh design mark have gained a reputation synonymous with fashion, quality, styling, and authenticity, the Swoosh design mark has gained substantial renown.

115.  La La Land's use of the Swoosh design mark and/or confusingly similar marks has caused, continues to cause, and/or is likely to cause irreparable injury to

and dilution of the distinctive quality of the Swoosh design mark in violation of Nike's rights under 15 U.S.C. § 1125(c). La La Land's wrongful use of the Swoosh design mark is likely to cause dilution by blurring and the whittling away of the distinctiveness and fame of the Swoosh design mark.

116. Upon information and belief, La La Land manufactured, distributed, sourced, sold, and/or supplied the Infringing Products bearing the Swoosh design mark and/or confusingly similar marks to others, including at least Warren Lotas, with knowledge that such Infringing Products would be advertised, offered for sale, and sold in the United States.

117. La La Land's manufacture, distribution, sourcing, selling, and/or supplying of the Infringing Products bearing the Swoosh design mark and/or confusingly similar marks it knew would be offered for sale or sold in the United States to Warren Lotas and others materially contributed to the dilution and likely dilution the famous Swoosh design by lessening its capacity to identify and distinguish Nike exclusively as the source for products bearing or provided under the famous Swoosh design.

118. La La Land and its customers such as Warren Lotas have used and continues to use in commerce the Swoosh design mark or confusingly similar marks in connection with the advertisement, promotion, and sale of the Infringing Products.

119. La La Land has materially assisted in Warren Lotas' and others' trademark dilution by its manufacture, distribution, sourcing, sale, and/or supply of the Infringing Products to Warren Lotas and others.

120. As a direct and proximate result of La La Land's trademark dilution and material contribution to others of the same, Nike has suffered, and will continue to suffer unless and until such activity is enjoined by this Court, irreparable damage and inherently unquantifiable injury and harm to its business, reputation, and customer goodwill that money cannot compensate.

121. La La Land's conduct is causing, and is likely to continue to cause, injury

to the public and to Nike, and Nike is entitled to injunctive relief and to recover La La Land's actual damages Nike has sustained, is sustaining, and/or is likely to sustain as a result of La La Land's wrongful acts, and/or an award of La La Land's profits, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1116 and 1117. Any such damages and/or profits awarded should be trebled pursuant to 15 U.S.C. § 1117(a).

## COUNT IV: UNFAIR COMPETITION
## UNDER CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*

122. Nike repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

123. By reason of the foregoing, Defendants have been, and are, engaged in unlawful, unfair and/or fraudulent business practices in violation of §§ 17200, et seq., of the California Bus. & Prof. Code.

124. On information and belief, La La Land manufactured, distributed, sourced, sold, and/or supplied the Infringing Products bearing the Asserted Marks to others, including at least Warren Lotas and John Geiger, whom it knows or has reason to know are engaging in trademark infringement, false designation of origin/unfair competition, and dilution of the Asserted Marks, and with knowledge that such Infringing Products would be advertised, offered for sale, and sold in the United States using and/or bearing the Asserted Marks.

125. By manufacturing, distributing, sourcing, selling, and/or supplying the Infringing Products using and/or bearing the Asserted Marks to Warren Lotas, John Geiger, and others, La La Land materially assisted or contributed to Warren Lotas' and John Geiger's sale of goods using and/or bearing the Asserted Marks in the United States, which is causing and is likely to continue to cause confusion, to cause mistake, or to deceive the public as to the origin, source, sponsorship, approval, or affiliation of Warren Lotas' products and John Geiger's products.  Such conduct therefore constitutes unfair competition, false representation, and a false designation of origin, all in violation of the California Business and Professional Code, § 17200, *et seq.*

126. On information and belief, John Geiger manufactured, distributed, sourced, sold, supplied, advertised, and/or offered for sale the Infringing Products bearing the Asserted Marks in the United States, which is causing and is likely to continue to cause confusion, to cause mistake, or to deceive the public as to the origin, source, sponsorship, approval, or affiliation of John Geiger's products. Such conduct therefore constitutes unfair competition, false representation, and a false designation of origin, all in violation of the California Business and Professional Code, § 17200, et seq.

127. Defendants had knowledge of Nike's superior rights in the Asserted Marks when it manufactured, distributed, sourced, sold, advertised, offered for sale, and/or supplied goods bearing the Asserted Marks in the United States.

128. As a direct and proximate result of Defendants' unlawful conduct, Nike has suffered, and will continue to suffer unless and until such activity is enjoined by this Court, irreparable damage and inherently unquantifiable injury and harm to its business, reputation, and customer goodwill that money cannot compensate.

129. Defendants' conduct is causing, and is likely to continue to cause, injury to the public and to Nike, and Nike is entitled to injunctive relief and to recover from Defendants actual damages Nike has sustained, is sustaining, and/or is likely to sustain as a result of Defendants' wrongful acts, and/or an award of Defendants' profits, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1116 and 1117. Any such damages and/or profits awarded should be trebled pursuant to 15 U.S.C. § 1117(a).

## COUNT V: DIRECT AND/OR CONTRIBUTORY COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

130. Nike repeats, realleges, and incorporates the preceding paragraphs as though fully set forth herein.

131. Nike was the first to use the Asserted Marks. As a result of Nike's continuous promotion and sales of products bearing the Asserted Marks for many

- 29 -

decades, the Asserted Marks have become widely known, and Nike has been identified in the public mind as the manufacturer of the products to which the Asserted Marks are applied.

132. As a result of the experience, care, and service of Nike in producing the products to which the Asserted Marks are applied, these products have become widely known and have acquired a worldwide reputation for fashion, quality, styling, and authenticity. Moreover, the Asserted Marks have come to symbolize Nike's reputation for quality and excellence.

133. Defendants, with knowledge and intentional disregard of Nike's rights, have manufactured, distributed, sourced, sold, advertised, offered for sale, and/or supplied products using the Asserted Marks and/or confusingly similar marks. Defendants' acts have caused, continue to cause, and/or are likely to cause confusion, to cause mistake, or to deceive the public as to the origin, source, sponsorship, approval, or affiliation of Defendants' products in violation of the common law of California.

134. Defendants' acts alleged herein and specifically, without limitation, Defendants' use, manufacture, distribution, sourcing, supplying, offers to sell, advertising, and/or selling in the United States numerous products that are confusingly similar to products bearing the Asserted Marks, infringe Nike's exclusive trademark rights in violation of the common law.

135. On information and belief, La La Land manufactured, distributed, sourced, sold, and/or supplied the Infringing Products bearing the Asserted Marks to others, including at least Warren Lotas and John Geiger, whom it knows or has reason to know are engaging in trademark infringement of the Asserted Marks, and with knowledge that such Infringing Products would be advertised, offered for sale, and sold in the United States using and/or bearing the Asserted Marks.

136. By manufacturing, distributing, sourcing, selling, and/or supplying numerous products that are confusingly similar to products bearing the Asserted

Marks to Warren Lotas, John Geiger, and others, La La Land materially assisted or contributed to Warren Lotas' and John Geiger' sale of goods using and/or bearing the Asserted Marks in the United States, which is causing and is likely to continue to cause confusion, to cause mistake, or to deceive the public as to the origin, source, sponsorship, approval, or affiliation of Warren Lotas' and John Geiger's products in violation of the common law of California.

137. By distributing, sourcing, selling, advertising, offering for sale, and/or supplying numerous products that are confusingly similar to products bearing the Asserted Marks, John Geiger is causing and is likely to continue to cause confusion, to cause mistake, or to deceive the public as to the origin, source, sponsorship, approval, or affiliation of John Geiger's products in violation of the common law of California.

138. As a direct and proximate result of Defendants' unlawful conduct, Nike has suffered, and will continue to suffer unless and until such activity is enjoined by this Court, irreparable damage and inherently unquantifiable injury and harm to its business, reputation, and customer goodwill that money cannot compensate. Defendants' conduct is causing, and is likely to continue to cause, injury to the public and to Nike, and Nike is entitled to injunctive relief and to recover from Defendants actual damages Nike has sustained, is sustaining, and/or is likely to sustain as a result of Defendants' wrongful acts, and/or an award of Defendants' profits, costs, and reasonable attorneys' fees under 15 U.S.C. §§ 1116 and 1117. Any such damages and/or profits awarded should be trebled pursuant to 15 U.S.C. § 1117(a).

## JURY DEMAND

1. Pursuant to Federal Rule of Civil Procedure 38(b), Nike hereby demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Nike respectfully prays for:

1. A judgment and order that Defendants willfully (A) infringed, both

directly and contributorily, the Asserted Marks in violation of 15 U.S.C. §1114, (B) directly and contributorily used false designations of origin in violation of 15 U.S.C § 1125(a), (C) directly and contributorily diluted at least the Swoosh design mark in violation of 15 U.S.C. § 1125(c), (D) engaged in unlawful, unfair or fraudulent business practices in violation of §§ 17200, *et seq*., of the California Bus. & Prof. Code; and (E) directly and contributorily violated Nike's common law rights in the Asserted Marks.

2. A judgment and order enjoining Defendants and their affiliates, officers, agents, employees, attorneys, and all other persons acting in concert with Defendants, during the pendency of this action and permanently thereafter from:

   a. Manufacturing, having manufactured, sourcing, having sourced, transporting, promoting, importing, advertising, publicizing, distributing, offering for sale, or selling any products (including but not limited to the Infringing Products) under the Asserted Marks or any other marks, names, symbols, or logos which, when sold by Defendants or others who purchase from Defendants and then sell direct to consumers, are likely to cause confusion or to cause mistake or to deceive persons into the erroneous belief that any products that Defendants caused, or helped cause, to enter the stream of commerce are sponsored or licensed by Nike, are authorized by Nike, or are connected or affiliated in some way with Nike or the Asserted Marks;

   b. Manufacturing, having manufactured, sourcing, having sourced, transporting, promoting, importing, advertising, publicizing, distributing, offering for sale, or selling any products (including but not limited to the Infringing Products) under the Asserted Marks

- 32 -

FIRST AMENDED COMPLAINT

and/or confusingly similar marks;

    c. Engaging in any act, either directly or indirectly, which is likely to dilute the distinctive quality of the Swoosh design mark and/or injures Nike's business reputation, and contributing and/or inducing others to do the same;

    d. Knowingly assisting, inducing, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in paragraphs 2(a) to (e) above.

3. An order that Nike is the exclusive owner of the Asserted Marks and that such marks are valid and protectable;

4. An order that Defendants be required to deliver to Nike for destruction any and all shoes, digital files, packaging, printed graphics, promotional materials, business cards, signs, labels, advertisements, flyers, circulars, and any other items in any of their possession, custody, or control bearing the Asserted Marks and/or confusingly similar marks;

5. An order granting an award of damages suffered by Nike according to proof at the time of trial;

6. An order that Defendants account to Nike for any and all profits earned as a result of Defendants' acts in violation of Nike's rights,

7. An award of three times the amount of compensatory damages and increased profits pursuant to 15 U.S.C. § 1117;

8. An order granting restitution of Defendants' profits earned from its unauthorized use of the Asserted Marks and/or confusingly similar marks in which profits Nike has a vested interest, pursuant to Cal. Bus. & Prof. Code § 17200, *et seq*.;

9. An order granting pre-judgment interest on any recovery by Nike;

10. An order granting an award of Nike's costs, expenses, and reasonable attorneys' fees; and

- 33 -

FIRST AMENDED COMPLAINT

1    11. Granting such other and further relief as is just and proper.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

Dated: August 26, 2021                ARNOLD & PORTER KAYE SCHOLER LLP

                                      By:  /s/ Rhonda R. Trotter

                                      Rhonda R. Trotter (SBN 169241)
                                        Rhonda.Trotter@arnoldporter.com
                                      Lauren S. Wulfe (SBN 287592)
                                        Lauren.Wulfe@arnoldporter.com
                                      ARNOLD & PORTER KAYE SCHOLER LLP
                                      777 South Figueroa Street, 44th Floor
                                      Los Angeles, California 90017-5844
                                      Telephone: (213) 243-4000

                                      Christopher J. Renk (admitted *pro hac vice*)
                                        Chris.Renk@arnoldporter.com
                                      Michael J. Harris (admitted *pro hac vice*)
                                        Michael.Harris@arnoldporter.com
                                      ARNOLD & PORTER KAYE SCHOLER LLP
                                      70 West Madison Street, Suite 4200
                                      Chicago, Illinois 60602-4231
                                      Telephone: (312) 583-2300

                                      Bridgette C. Boyd (SBN 313806)
                                        Bridgette.Boyd@arnoldporter.com
                                      ARNOLD & PORTER KAYE SCHOLER LLP
                                      601 Massachusetts Ave., NW
                                      Washington, D.C. 20001
                                      Telephone:  (202) 942-6745

                                      Kyle A. Schneider (SBN 326552)
                                        Kyle.Schneider@arnoldporter.com
                                      Michael H. Sapiro (admitted *pro hac vice*)
                                        Michael.Sapiro@arnoldporter.com
                                      ARNOLD & PORTER KAYE SCHOLER LLP
                                      250 West 55th Street
                                      New York, NY  10019-9710
                                      Telephone:  (212) 836-8453

                                      *Attorneys for Plaintiff Nike, Inc.*

FIRST AMENDED COMPLAINT